## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

MICHELLE GLENN,

                Plaintiff,

v.

CITY OF MIAMI and MARIO F. NUNEZ (Individually, and in his official capacity as Director of the City of Miami's Solid Waste Department),

              Defendants.

Case No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Michelle Glenn, ("**Plaintiff** or "**Ms. Glenn**"), by her undersigned counsel, Derek Smith Law Group, PLLC, hereby complains of Defendant City of Miami ("**City**") and Defendant Mario F. Nunez ("**Mr. Nunez**") (Individually, and in his official capacity as "Director" of the City's Solid Waste Department), and alleges as follows:

## INTRODUCTION

1.    This case is about a public servant whose City Director induced her to perform dozens of sexual acts in exchange for tangible employment benefits, including the job of her dreams.

2.    Plaintiff Michelle Glenn brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("**Title VII**"), the Florida Civil Rights Act of 1992, §760.01, *et seq.*, Florida Statutes ("**FCRA**"), and 42 U.S.C. § 1983 ("**§1983**") to redress the deprivation of Plaintiff's rights, privileges and immunities secured by the laws and Constitution of the United States.  Plaintiff also brings claims pursuant to the Constitution of Florida, in addition to common law torts.

3.     Plaintiff seeks monetary relief to redress Defendant City of Miami's unlawful employment practices in violation of Title VII and the FCRA.  Ms. Glenn also seeks monetary relief to redress the deprivation of her fundamental rights secured by the laws and Constitution of the United States.

4.     Mr. Nunez used his authority under color of law as the Director of the City of Miami's Solid Waste Department to directly and personally deprive Ms. Glenn of her clearly established rights secured by the Constitution and laws of the United States.  Ms. Glenn seeks punitive damages against Defendant Nunez because he intentionally, directly, and willfully deprived Plaintiff of her equal protection rights motivated by evil intent.

5.     Mr. Nunez induced Ms. Glenn to perform sexual acts in exchange for tangible job benefits—namely "Assistant Director" of the Solid Waste Department.  From about January of 2017 to May of 2017, Ms. Glenn performed oral sex on Mr. Nunez several times per week, every week, for five months in exchange for access to City conferences, executive level workshops, and speaking appointments on behalf of the Solid Waste Department at City Commission meetings. Ultimately, however, Ms. Glenn submitted to Mr. Nunez's sexual demands because he promised her the role of "Assistant Director" of the Solid Waste Department, and the benefits of Working out of Class, as the de facto "Assistant Director" during the Spring of 2017.

6.     Every time Ms. Glenn performed sexual acts on Mr. Nunez—for example on his birthday at a Miami hotel in January of 2017, or in the Solid Waste building after hours, or in the City Hall parking lot on Commission days—Mr. Nunez would unzip his pants and tell Plaintiff things like, "you're gonna get the job," or, "You'll be my right hand at the next Commission meeting," or, "Send me your Working out of Class paperwork."

7.     Indeed, Mr. Nunez went from calling Ms. Glenn "incompetent" a "whore," and spreading rumors that she was "sleeping around," to allowing her to speak on behalf of the Solid Waste Department at bi-weekly City Commission meetings.

8.     Ultimately, however, Mr. Nunez did not appoint Ms. Glenn as the "Assistant Director."  He did not even consider her.  Consequently, after months of performing sexual acts on Mr. Nunez—only not to get the job, the sole reason she acquiesced to his demands—Ms. Glenn was diagnosed with anxiety and depression.  From August of 2017 to January of 2018, Ms. Glenn took FMLA leave to treat her disabilities caused by her employment.  Upon her return, the City transferred Ms. Glenn to another department, and her dream of becoming "Assistant Director" fell by the wayside.

9.     Ms. Glenn has applied to various City jobs since her transfer, but no department has advanced her to any interviews.  Effectively, the City and Mr. Nunez have blackballed Plaintiff from advancing her City career.  Plaintiff had prepared her entire life to be a public servant her entire life.  Now, at the hands of the City and Mr. Nunez, all of that was over.

10.    At bottom, Defendants are liable for depriving Ms. Glenn of her personal dignity, her constitutional rights, and her civil right to pursue an equal employment opportunity in a work environment free of unrelenting sexual harassment and retaliation.

<u>**JURISDICTION AND VENUE**</u>

11.    The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 (federal question), 1343(a)(3) (civil rights), 42 U.S.C. §2000e-5(f)(3) (Title VII), and §1367 (supplemental jurisdiction).

12.     Venue is proper in the Southern District of Florida under 42 U.S.C. § 20003-5(f)(3) and 28 U.S.C. § 1391(b) because all of the events giving rise to this action occurred in the Southern District of Florida.

## PARTIES

13.     Plaintiff Michelle Glenn is citizen of the United States, a resident of Florida, and a woman of African American descent.

14.     Plaintiff is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. §§ 2000e-5(f)(1) and (3).  Plaintiff has an implied cause of action to bring this suit under § 1983.

15.     Defendant City of Miami is a governmental body established pursuant to the laws of Florida and is located within this judicial circuit.

16.      Defendant City of Miami is a "person" within the meaning of 42 U.S.C. §2000e(a) and 42 U.S.C. § 1983, and an "employer" within the meaning of 42 U.S.C. §2000e(b).

17.     Defendant Mario Nunez is a citizen of the United States, a resident of Florida, and at all relevant times was employed by the City of Miami as the "Director" of the City's Solid Waste Department.

18.     Defendant Nunez is the "Director" of Defendant City of Miami's Solid Waste Department.  As the Director of the Solid Waste Department, Mr. Nunez has final policy-making authority.

19.     Defendant Nunez is suspectable to individual liability under section 1983 for depriving Plaintiff of her rights, privileges, and immunities secured by the laws and Constitution of the United States.

## ADMINISTRATIVE PREREQUISITES

20.     Ms. Glenn has complied with all administrate requirements.

21.     On or about August 23, 2018, Plaintiff timely dual-filed a charge of discrimination (Charge No. 510-2018-01894) with the U.S. Equal Employment Opportunity Commission ("**EEOC**"), and the Florida commission on Human Relations ("**FCHR**"), naming the City of Miami as the Respondent.  Ms. Glenn claimed the City subjected her to race, national origin, and sex discrimination.  On or about April 23, 2020 Plaintiff amended her charge of discrimination (Charge No. 510-2018-01894) to include a retaliation claim.

22.     180 days have elapsed since Plaintiff dual-filed her charges of discrimination.

23.     On or about January 14, 2021, the EEOC issued Plaintiff a right to sue notice.

24.     This Complaint was timely filed within 90 days of the EEOC's notice of Plaintiff's suit rights.

## FACTUAL ALLEGATIONS

25.     Plaintiff Michelle Glenn is a 38-year-old African American woman of Jamaican national origin.

26.     On or about August 25, 2015, the City Manager hired Ms. Glenn as the "Administrative Services Manager" of the City's Solid Waste Department (the "Department"). Ms. Glenn's responsibilities included heading the Department's "Human Resources" and "Payroll and Customer Service."

27.     Ms. Glenn managed the day-to-day operations of the Solid Waste Department, overseeing the activities of about 200 Department of Solid Waste employees, including hiring dozens of employees in her own right.

28.     In or around January of 2018, when Ms. Glenn returned from FMLA leave—after submitting to Mr. Nunez's sexual demands, losing out on the job, and being diagnosed with anxiety and depression—the City transferred Plaintiff to the Neighborhood Enhancement Team.

29.     Ms. Glenn was and is a highly qualified municipal employee.  Indeed, Ms. Glenn holds master's degrees in Public Administration and Urban Planning.  Ms. Glenn was the "Senior Planner" for the Miami-Dade County Department of Solid Waste for 6 years.  Naturally, Ms. Glenn came highly recommended to the City's Department.

30.     Mario Nunez is the "Director" of the City of Miami's Department of Solid Waste. Mr. Nunez held direct supervisory authority over Plaintiff controlling various terms and conditions of her employment.

31.     Mr. Nunez was the final policymaker for the Department with authority to alter job descriptions and responsibilities.

**Defendant Nunez Subjects Plaintiff to an Unrelenting Hostile Work Environment**

32.     Mr. Nunez opposed Ms. Glenn's hiring from the beginning.  Mr. Nunez was not bashful in apprising Ms. Glenn of this feeling.  Indeed, Mr. Nunez refused to cooperate with Ms. Glenn in all aspects of her employment.  For instance, Mr. Nunez refused to hold bi-weekly with Ms. Glenn.  He refused to sign documents.  He called Ms. Glenn "incompetent."  He called her a "whore."  He spread rumors that she was "sleeping around."  Consequently, Mr. Nunez's hostility had a deleterious effect on the functionality of the department, Ms. Glenn's ability to lead, and ultimately the half-million taxpaying residents of Miami.

33.     Mr. Nunez did everything in his power to isolate, undermine, and outcast Ms. Glenn.  In or around September of 2015, Mr. Nunez began setting Ms. Glenn up for failure.  For instance, Mr. Nunez would roam the Department building and tell Plaintiff's subordinates and

fellow City executives things like, "Michelle can't handle the job because she's incompetent." Other times he would make his resentment for Ms. Glenn more obvious.  For example, if someone asked for Ms. Glenn, the Director would say, "Go speak to the person next door."

34.     Mr. Nunez failed to hold one-on-one meetings with Ms. Glenn.  On other occasions Mr. Nunez would scream at Ms. Glenn for no apparent reason.  "I need this done the *right way*!" he would say.  Yet, Mr. Nunez never articulated what the "*right* way" was.   Instead, he would say, "Jesus, Michelle, you're incompetent."  Worse, Mr. Nunez's refusal to speak with Ms. Glenn affected the functionality of the Department, and ultimately, the half-a-million residents of Miami.

35.     Yet, Mr. Nunez delegated his most significant tasks to Plaintiff.  Throughout the Fall of 2015, Mr. Nunez demanded Ms. Glenn to complete his job duties on top of her own.  For example, Mr. Nunez required Ms. Glenn to handle the scheduling and payroll for 71 Department employees—a job duty that would add hours to Ms. Glenn's workload.  Consequently, Plaintiff began working thirteen-hour days … 6:00 A.M. to 10 P.M. on a routine basis.

36.     Mr. Nunez discriminated against Ms. Glenn because of her sex.  Within a month of Plaintiff's start with the Department, Mr. Nunez began spreading rumors that she was "sleeping around."  Indeed, Mr. Nunez spread this rumor to anyone who would listen—both throughout the Department and at the Miami Riverside Center.  Of course, dozens of Ms. Glenn's subordinates began repeating Mr. Nunez's baseless theories, and began treating Ms. Glenn with a lack of respect because of the Director's actions.

37.     On or about February 5, 2016, ("Take Your Child to Work Day,") Mr. Nunez started calling Ms. Glenn a "whore."  Mr. Nunez's rationale: Plaintiff greeted her co-workers with the traditional Miami "cheek kissing."  To be sure, kissing someone hello in Miami is a cultural norm.  In fact, Ms. Glenn—one of the only non-Hispanic managers in the Department—began

greeting her co-workers this way just to fit in—a tall task after Mr. Nunez spent months undermining Ms. Glenn's abilities.  Nonetheless, Mr. Nunez never referred to his male or Hispanic employees as "whores" for greeting each other in the Miami way.

38.     Throughout the Spring of 2016, Mr. Nunez increased his hostility toward Ms. Glenn.  Mr. Nunez made her job impossible.  For instance, the Director refused to sign Department documents.  Ms. Glenn pleaded with Mr. Nunez.  "Please," she would say, "I need to get this done for payroll."  Mr. Nunez was defiant.  On some occasions he would flat out ignore Ms. Glenn.  As a result, Ms. Glenn's subordinates disregarded her leadership role.

39.     In or around July of 2016, Mr. Nunez's hostility and lack of cooperation with Ms. Glenn persisted.  As the Department's head of Payroll, Ms. Glenn was having issues with Department attendance.  However, as the Department's *head of H.R.*, Ms. Glenn had no choice but to complain outward—especially after recognizing that complaining to Mr. Nunez was and would always be an effort in futility.

40.     In turn, Ms. Glenn requested a meeting to complain with the Labor Department.  However, the Labor Department refused to meet with Ms. Glenn—at Mr. Nunez's request.  Indeed, on or about Monday, July 25, 2016, the Labor Department cancelled its scheduled meeting with Plaintiff.  Teresita Perez ("**Ms. Perez**"), the Senior Specialist of Labor, emailed Mr. Nunez in response to Plaintiff's request for a meeting.  However, Mr. Nunez responded and asked if the meeting could be delayed because he was "in a conference" and was unavailable until Thursday July 28, 2016.  Consequently, the Labor Department delayed the meeting and never rescheduled.

41.     On or about October 4, 2016, Ms. Glenn emailed Mr. Nunez and Ms. Perez concerning the Department's persisting attendance issues.  Once again, Mr. Nunez refused to meet

with Plaintiff.  Thus, the issues festered, the Department faltered, and the Director left Ms. Glenn to her own devices.

42.    On or about October 17, 2016, Mr. Nunez continued to refer to Ms. Glenn as the "person next door" to her co-workers, colleagues, and City officials.

43.    On or about October 18, 2016, Ms. Glenn went to the Assistant City Manager to complain.  Ms. Glenn explained that Mr. Nunez was not helping her with anything: he refused to hold bi-weekly meetings, he refused to sign documents, he refused to address the attendance issues, and he continued undermining Ms. Glenn, setting her up for failure at every turn.

44.    The Assistant City Manager did nothing to help Ms. Glenn—not even a little.

45.    To be sure, the City had actual knowledge of the Solid Waste Department's issues and Mr. Nunez's insistence not to cooperate with Ms. Glenn.  Yet, the City took no action. Consequently, Mr. Nunez began abusing and harassing Ms. Glenn for months on end.

**Defendant Nunez Induces Plaintiff to Perform Sexual Acts in Exchange for Job Benefits**

46.    In or around late-December of 2016, Mr. Nunez began sexually harassing Ms. Glenn on a repeated, continual, and ongoing basis.

47.    At first Mr. Nunez began flirting with Ms. Glenn.  Then he started making unwanted sexual advances.  Then he began groping her, digitally penetrating her, and induced her to perform oral sex in exchange for the job as "Assistant Director" of the City's Solid Waste Department.

48.    For example, in or around December of 2016, when Ms. Glenn requested Mr. Nunez to sign Department documents, he would ask her to come to his office after hours for his signature.  However, Mr. Nunez's signature came with a price.  Indeed, in exchange for inappropriate, offensive, and unwanted sexual advances, Mr. Nunez would sign Department

documents.  For instance, on one of the first occasions, in or around mid-December of 2016, Mr.

Nunez would say, "Come sit next to me," gesturing to the empty chair beside him.  Ms. Glenn held

the documents in her hand, confused.  Ms. Glenn told Mr. Nunez all she needed was for him to

sign a document.  He insisted.  The Director was smiling, and his eyes were open-wide.  The look

Ms. Glenn extremely uncomfortable.  To Mr. Nunez, Plaintiff was an object he was going to get.

49.     Ms. Glenn sat down next to Mr. Nunez because it was the first time he attempted

to cooperate.  But this was a mistake.  Mr. Nunez slid his hand between Ms. Glenn's legs and

began squeezing her thighs, rubbing them.  Ms. Glenn felt the blood rush out of her face.  When

Mr. Nunez's sensed Ms. Glenn's extreme discomfort, he signed the documents and let her go.

50.     The next time, however, Mr. Nunez ramped up his sexual advances.  Sometime

around Christmas of 2016, Mr. Nunez summoned Ms. Glenn to his office at 7 P.M.  Earlier that

day Ms. Glenn had requested Mr. Nunez's signature on various Department documents.  Mr.

Nunez compelled Ms. Glenn to sit down because the functionality of the Department depended on

his signature.  As he looked over the documents, Mr. Nunez placed Ms. Glenn's hand between his

legs.  Mr. Nunez slid Plaintiff's hand up his thigh, towards his crotch, and then wrapped her hand

around his genitals.  Mr. Nunez continued looking over the documents, and placed his signature

in the appropriate places.

51.     Meanwhile, Ms. Glenn felt the Director's erection grow beneath her hand.  A

moment later, after becoming extremely uncomfortable—realizing what exactly what was

transpiring—Ms. Glenn removed the Director's hand, grabbed the documents, and left his office.

52.     In or around early January of 2017, Mr. Nunez would solicit mouth-to-mouth

kissing with Ms. Glenn in his office after-hours.  Mr. Nunez would remove his tongue from

Plaintiff's mouth and talk about her career with the City.  He spoke about the vacancy of the Assistant Director position, and told Plaintiff that she would be the perfect fit.

53.     On or about January 19, 2017, Ms. Glenn performed oral sex on Mr. Nunez for his birthday at the Starlight East Motel.  The two checked in to the Downtown Miami motel around lunchtime.  As they were getting their room key, Mr. Nunez said, "I really need you to be the Assistant Director. Get me your resume, and I'll make sure you get the job."

54.     When they got inside the room, Mr. Nunez pulled Ms. Glenn into his arms, groped her back and began kissing her.  He said, "You're gonna get everything."  The Director unzipped his pants, pushed Ms. Glenn's head down, and prompted her to begin performing oral sex.

55.     On or about February 9, 2017, Mr. Nunez texted Ms. Glenn at 9:13 A.M, "[C]an you forward either your resume or job application for AD to me?"  At 9:33 A.M, Ms. Glenn texted, "Done. Thanks."

56.     Around this time, Mr. Nunez began cooperating with Ms. Glenn.  He stopped screaming at Ms. Glenn for unknown reasons.  He stopped calling her "incompetent."  He stopped referring to her as a "whore."  He stopped spreading rumors that Plaintiff was "sleeping around."

57.     Once Ms. Glenn began acquiescing to the Director's sexual demands, Mr. Nunez began hosting Plaintiff for their bi-weekly meetings.   As a result, the functionality of the Department increased, and Mr. Nunez continued promising Ms. Glenn the role of "Assistant Director."

58.     To be sure, this was not a relationship between two consenting adults.  Instead, this was a transaction by Mr. Nunez, the Director of the City's Department of Solid Waste.  Mr. Nunez promised Ms. Glenn that she would become the "Assistant Director" in exchange for oral sex over a five-month period.

59.     Moreover, as an unclassified, salaried employee without overtime, compensation time, or union protection, Ms. Glenn was coerced to follow the Director's orders merely to keep a roof over her head.

60.     Throughout the Spring of 2017, Mr. Nunez began prepping Ms. Glenn as the de facto Assistant Director.  Mr. Nunez touted Ms. Glenn around the City, bringing her to various workshops and high-profile City events.  For example, in or around February of 2017, Mr. Nunez brought Ms. Glenn to a workshop at a City of Miami executive retreat, providing an exclusive networking opportunity to Plaintiff.

61.     From February to May of 2017, Mr. Nunez brought Ms. Glenn to nearly every City Commission meeting.  Mr. Nunez deferred to Ms. Glenn, allowing Plaintiff to speak on behalf of the Solid Waste Department.  On other occasions, Mr. Nunez allowed Plaintiff to recommend discipline, prolong disciplinary matters, and make specific recommendations adopted by the City Commission.

62.     During the lunch breaks of Commission days Mr. Nunez would ask to into Ms. Glenn's car to make out with her in the backseat in the City Hall parking lot.  Mr. Nunez would grope Ms. Glenn and say things like, "I'm prepping you for the job," or, "you did great up there," commending Plaintiff on her representation of the Department.  On other occasions, Mr. Nunez would address his past treatment of Ms. Glenn.  "I treated you very badly," he would say. "I'm sorry."

63.     Throughout the Spring of 2017, Mr. Nunez would take Ms. Glenn out for "business lunches," where he would buy her lunch, and then solicit sexual acts.  Weekly, throughout the Spring of 2017, Mr. Nunez would summon Ms. Glenn to his office after hours to receive sexual favors.  Mr. Nunez would close the office blinds to ensure no one could see them from outside.

They would lay on the couch in his office.  Mr. Nunez would begin groping and kissing Ms. Glenn.  Ms. Glenn performed oral sex on Mr. Nunez every single week, multiple times per week.

64.     Mr. Nunez began spending so much time with Ms. Glenn that Plaintiff developed nicknames for his children.  Occasionally, on days Mr. Nunez was not ushering Ms. Glenn around the City, the Director's kids would come to the Department around lunchtime.  His kids would say, "Where's Ms. Michelle?"  One time, in or around mid-March of 2017, Ms. Glenn became extremely uncomfortable when Mr. Nunez's wife visited the Department.  Ms. Glenn asked Mr. Nunez's kids who she was.  "That's our mom," the kids said.

65.     In or around early April of 2017, Mr.  Nunez continued soliciting sexual favors from Ms. Glenn.  Mr. Nunez would discuss the logistics of the Assistant Director position, promising Ms. Glenn that he would appoint her, and then ask Plaintiff to perform oral sex on him.  In between kissing, or after Ms. Glenn finished the act, Mr. Nunez would say, "Make sure everything's in order—I'm gonna put you on the eligible register."

66.     To be sure—at the commands of Mr. Nunez—Plaintiff was already performing the essential functions of the Assistant Director.  Yet, Ms. Glenn was denied any pay increases for Working out of Class pay, which, as per City policy, is a 5% increase.  However, the City Manager's Office flat out denied Ms. Glenn's requests—at the Director's request.

67.     On or about Friday April 21, 2017, at our around 1 P.M., Mr. Nunez scheduled Ms. Glenn attended a Department press conference.

68.     Ms. Glenn continued performing sexual acts for Mr. Nunez through late May of 2017.

**<u>Defendant Nunez Denies Plaintiff "Assistant Director," Plaintiff Takes Medical Leave, and the City Transfers Her to Another Department</u>**

69.     On or about May 25, 2017, Mr. Nunez ordered Ms. Glenn to close payroll for 200 employees within two days.  He texted, "You will have to step in as backup because no one else is available."  Ms. Glenn was taken aback because she knew such a task would be impossible.  However, she said, "On top of everything else, of course I will."  Yet, Ms. Glenn also apprised Mr. Nunez of a larger issue: "Later, we need to seriously talk about staff attendance."

70.     Unbeknownst to Plaintiff, Mr. Nunez held the interview process for Assistant Director from May 25 through May 27.  Mr. Nunez did not appoint Ms. Glenn to the position.

71.     Further, Ms. Glenn learned that towards the end of Spring of 2017, Mr. Nunez was holding major recruitment events for the Assistant Director position without her knowledge.  Indeed, Mr. Nunez held one recruitment and interview process, held a separate recruitment process to advertise the position among multiple solid waste organizations, and another another interview process on a national level.

72.     Meanwhile, Mr. Nunez continued promising Ms. Glenn the role, inducing her to perform sexual acts in exchange for a promise Mr. Nunez intended to give to someone else—a less qualified candidate who did not submit to months of sexual acts at the Director's demands.

73.     On or about Friday, June 9, 2017, Mr. Nunez texted Ms. Glenn, "We have plenty of time to do the AD paperwork … Congratulations in advance!"

74.     Ultimately, Mr. Nunez appointed Jennifer Moy ("**Ms. Moy**") as "Assistant Director"—a non-black, Hispanic employee from Mr. Nunez's native country of Honduras.  Ms. Moy had no experience in municipal administration or waste management.  Ms. Moy was not even on the eligible roster for candidates—a City requirement.  However, Ms. Moy did have a brother who was the President of the City's General Employees Union … which for Mr. Nunez was extremely valuable political capital.

75.     Indeed, Mr. Nunez hired Ms. Moy in part because he already had a strong relationship with the Sanitation Union.  But now, after hiring Mr. Moy as "Assistant Director," Mr. Nunez set himself with ties to the two major unions available to civilian municipal employees.

76.     Hence, to allow Ms. Moy to become on the eligible roster, the Director had to alter the job requirements for the Assistant Director position to accommodate her inadequacies. Conversely, Ms. Glenn's appointment would have needed no such adjustment to the requirements of the Assistant Director.

77.     In or around October of 2017, Ms. Glenn filed a sexual harassment and race discrimination complaint with the City's Equal Opportunity and Diversity Programs office.

78.     Around this time, Ms. Glenn was diagnosed with Depression and Anxiety, and prescribed multiple medications as a result of Mr. Nunez's harassment.  Indeed, as of today, in or around April of 2021, Ms. Glenn still takes at least three medications multiple times per day.

79.     After taking a medical leave of absence, Plaintiff began her new less favorable role as an employee in the City's Neighborhood Enhancement Team.

80.     Plaintiff has attempted to transfer to multiple departments, but the City has denied Ms. Glenn interview opportunities at every turn—even for jobs which she is overqualified for.

81.     To be sure, Plaintiff's public service career was stymied by Mr. Nunez and the City because of her sex and because she complained about harassment, discrimination, and retaliation.

82.     The above are just some of the examples of unlawful sex discrimination and retaliation Defendants subjected Ms. Glenn to on a repeated and ongoing basis.

83.     Defendants unlawfully discriminated against Ms. Glenn because of her sex and because she complained and opposed sexual harassment and retaliation.

84.     Ms. Glenn alleges a continuous practice of discrimination and claims that Defendants are subjecting her to continuing violations and makes all claims herein under the continuing violations doctrine.

85.     Ms. Glenn alleges constructive and/or actual discharge to the extent she is terminated from her position as a result of the herein detailed unlawful discrimination and retaliation.

86.     Plaintiff claims aggravation, activation, and/or exacerbation of any preexisting conditions.

87.     As a result of Defendants' unlawful conduct, Plaintiff has suffered damages, including but not limited to financial and economic damages, lost wages (back pay and front pay) and benefits, advancement opportunities with the City, and continues to suffer the same.

88.     Ms. Glenn has also suffered—and has a record of suffering—emotional distress, mental anguish, loss of personal dignity, and other intangible damages, evinced by her anxiety and depression diagnoses, and the prescription medication she takes today as a result of Mr. Nunez's harassment.

89.     Plaintiff also seeks punitive damages against Defendant Nunez as Mr. Nunez willfully violated Plaintiff's clearly established rights by depriving Ms. Glenn of her civil right to pursue an equal employment opportunity in an environment free of sexual harassment and retaliation.

90.     At bottom, Defendants are liable for violating Plaintiff's personal dignity and depriving her of her civil and constitutional rights to purse an equal employment opportunity in a work environment free from unrelenting sexual harassment, discrimination, and retaliation.

## CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983
### Fourteenth Amendment Equal Protection Clause
### Sex Discrimination
### (Against Defendant Nunez)

91.     Plaintiff reincorporates the allegations contained in paragraphs 25-90.

92.     Section 1983 provides that:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

93.     Under the Equal Protection Clause, individuals have a constitutional right to be free from unlawful sexual harassment in public employment.

94.     A plaintiff may establish supervisory liability under § 1983 by showing the supervisor directly participated in the unconstitutional conduct.

95.     Defendant Nunez acted under color of law when he directly deprived Plaintiff of her equal protection rights by intentionally discriminating against Plaintiff because of her sex.

96.     As described in paragraphs 44-59, Defendant Nunez exchanged sexual favors, including oral sex and digital penetration, for tangible job benefits.  Defendant Nunez allowed Plaintiff to attend high-profile events, networking opportunities, and allowed Plaintiff to speak on behalf of the Department at City Commission meetings.  During the breaks of these events—or on weekdays, after hours in Defendant Nunez's office, or on his birthday at an offsite motel—Defendant Nunez solicited sexual favors from Plaintiff because of her sex.  To be sure, Plaintiff only participated in sexual activity with Defendant Nunez because he promised her the

aforementioned benefits, including the job as "Assistant Director" of the City's Solid Waste Department.

97.     Defendant Nunez incessantly referred to Plaintiff as a "whore" and spread rumors around the City and the Department that Plaintiff was "sleeping around" with City of Miami officials.

98.     Defendant Nunez is personally liable because he was cloaked with the color of state law, as Director of City of Miami's Department of Solid Waste, by depriving Plaintiff of her constitutional rights.

99.     Defendant Nunez knew that his intentional discrimination against Plaintiff because of her sex was a violation of her rights, privileges and immunities.  Indeed, any reasonable official would understand that he was violating an individual's equal protection rights by exchanging tangible job benefits for sexual favors.

100.    Defendant Nunez violated Plaintiff's right to equal protection by intentionally discriminating against her because of her sex.

101.    Defendant Nunez's deprivation of Plaintiff's federal rights were motivated by evil intent, and/or involved callous indifference to Plaintiff's federal protected rights.  Defendant Nunez had a subjective consciousness indifference to civil obligations by repeatedly, willfully, and intentionally depriving Plaintiff of her equal protection rights for months on end.  As such, Plaintiff seeks punitive damages against Defendant Nunez.

102.    As a result of Defendant Nunez's deprivation of Plaintiff's equal protection rights, Plaintiff has suffered damages.

**COUNT II**
**42 U.S.C. § 1983**
**Fourteenth Amendment Equal Protection Clause**
**(Entity Liability)**
**(Against Defendant City of Miami)**

103.    Plaintiff reincorporates the allegations contained in paragraphs 25-90.

104.    Under the Equal Protection Clause to the United States Constitution, public employees have a constitutional right to be free from unlawful sexual harassment in public employment.

105.    A plaintiff may establish municipal liability by showing the municipality itself causes the constitutional violation at issue.

106.    A plaintiff may establish entity liability by showing an unofficial custom or practice of the City shown through repeated acts or decision of a municipal official with final policy-making authority.

107.    Municipal liability attaches under § 1983 where a deliberate choice to follow a course of action is made from among various alternatives

108.    Pursuant to state law, as Director of the City of Miami Solid Waste Department, Defendant Nunez is a municipal official with final policymaking authority.

109.    Defendant Nunez acted under the color of state law to deliberately deprive Plaintiff of her rights, privileges and immunities secured by the Fourteenth Amendment to the U.S. Constitution and laws of the United States.

110.    As described in paragraphs 44-59, Defendant Nunez exchanged sexual favors, including oral sex and digital penetration, for tangible job benefits.  Defendant Nunez allowed Plaintiff to attend high-profile events, networking opportunities, and allowed Plaintiff to speak on behalf of the Department at City Commission meetings.  During the breaks of these events—or

weekdays, after hours in Defendant Nunez's office, or on his birthday at an offsite motel—
Defendant Nunez solicited sexual favors from Plaintiff.  To be sure, Plaintiff only participated in
sexual activity with Defendant Nunez because he promised her the aforementioned benefits,
including the job as "Assistant Director" of the City's Solid Waste Department.

111.    From January of 2017 to May of 2017, Defendant Nunez solicited sexual acts from
Plaintiff on municipal property, including during daily lunchtime sex encounters in Defendant
Nunez's office, in the City Hall parking lot, and at off-city locations during unofficial "business
lunches."

112.    The City of Miami is liable because Defendant Nunez was directly involved in the
deprivation of Plaintiff's Fourteenth Amendment constitutional rights.

113.    Moreover, any reasonable official in Defendant Nunez's position would know that
soliciting sexual favors from a subordinate in exchange for tangible job benefits is a violation of
the Fourteenth Amendment Equal Protection Clause.

114.    As a direct and proximate result of Defendants' unlawful employment practices,
Plaintiff has suffered damages.

<u>**COUNT III**</u>
**42 U.S.C. § 1983**
**Art. 1, § 2, Fla. Const.**
**Basic Rights**
<u>**(Against all Defendants)**</u>

115.    Plaintiff reincorporates the allegations contained in paragraphs 25-90.

116.    The Florida Constitution's basic rights states that "all persons, men and woman,
shall have equal protection under the law."

117.    The Florida Supreme Court construes article 1, section 2 of the Florida Constitution to function in a manner similar to that embraced by the Fourteenth Amendment.  *Sasso v. Ram Prop. Mgmt.*, 452 So. 2d 932 (Fla. 1984).

118.    Defendant Nunez, acting under color of state law, deliberately and personally deprived Plaintiff of her basic rights guaranteed under the Florida Constitution by intentionally discriminating against Plaintiff because of her sex.

119.    Defendant Nunez was clothed with state authority when he deprived Plaintiff of her basic rights guaranteed by article 1, section 2 of the Florida Constitution.  Such deprivation was motivated by evil intent.

120.    As described in paragraphs 44-59, and throughout this Complaint, Defendant Nunez deprived Plaintiff of her equal protection rights by exchanging sexual favors, including oral sex and digital penetration, for tangible job benefits.  Additionally, Defendant Nunez referred to Plaintiff as a "whore," spread rumors that she was "sleeping around," groped her, placed her hands on his genitals, and induced her to perform a variety of sexual acts, because of her sex, from January of 2017 to May of 2017.

121.    The City of Miami is liable because Defendant Nunez was directly involved in the deprivation of Plaintiff's Fourteenth Amendment constitutional rights.

122.    Moreover, any reasonable official in Defendant Nunez's position would know that soliciting sexual favors from a subordinate in exchange for tangible job benefits is a violation of the Florida Constitution article 1, section 2.

123.    As a result of Defendant Nunez's intentional deprivation of Plaintiff's Florida constitutional rights, Plaintiff has suffered damages.

### COUNT IV
### Title VII, 42 U.S.C. § 2000e-2(a)(1)
### Hostile Work Environment
### (Against City of Miami)

124.     Plaintiff reincorporates the allegations contained in paragraphs 25-90.

125.     The City discriminated against Plaintiff because of her sex in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), by subjecting her to relentless harassment because of her sex.

126.     Hostile work environment sexual harassment arises when an employer's conduct has the purpose or effect of unreasonably interfering with an individual's work performance or otherwise created an intimidating, hostile, or offensive environment.  Such conduct includes sexual advances, requests for sexual favors, and other conduct of a sexual nature.

127.     As described throughout this complaint, Nunez's repeatedly engaged in verbal and physical conduct of a sexual nature, which altered the terms and conditions of Plaintiff's job performance.

128.     Mr. Nunez would call Plaintiff a "whore" and spread rumors that she was "sleeping around" with City officials.  The effect of these statements to Ms. Glenn's coworkers created an unreasonably

129.     As described in paragraphs 44-59, Defendant Nunez exchanged sexual favors, including oral sex and digital penetration, for tangible job benefits.  Defendant Nunez allowed Plaintiff to attend high-profile events, networking opportunities, and allowed Plaintiff to speak on behalf of the Department at City Commission meetings.  During the breaks of these events—or weekdays, after hours in Defendant Nunez's office, or on his birthday at an offsite motel— Defendant Nunez solicited sexual favors from Plaintiff.  To be sure, Plaintiff only participated in

sexual activity with Defendant Nunez because he promised her the aforementioned benefits, including the job as "Assistant Director" of the City's Solid Waste Department.

130.    From January of 2017 to May of 2017, Defendant Nunez solicited sexual acts from Plaintiff on municipal property, including during daily lunchtime sex encounters in Defendant Nunez's office, in the City Hall parking lot, and at off-city locations during unofficial "business lunches."

131.    The harassment was severe and pervasive, and materially altered Plaintiff's working conditions, creating an objectively hostile and abusive working environment that a reasonable person would find hostile or abusive, as well as an environment that Plaintiff perceived as hostile or abusive, which adversely affected the terms, conditions, and privileges of Plaintiff's employment.

132.    Indeed, the severe nature of Mr. Nunez's sexual solicitations, including oral sex and digital penetration on a weekly basis for five months falls well within the type of conduct proscribed by Title VII.

133.    Moreover, the pervasive nature of Mr. Nunez's solicitation of sexual advances— oral sex weekly, from January 2017 through May of 2017—also creates a hostile work environment.

134.    The City of Miami is automatically vicariously liable for Nunez's supervisory sexual harassment.  Nunez, the Director of the City's Department of Solid Waste, holds such a high position with the Department and the City that he is the alter ego of both.

135.    Alternatively, the City of Miami is liable for Nunez's supervisory sexual harassment because the City knew or should have known of the alleged harassment but failed to take prompt remedial action.

136.    As a result of the unlawful employment practices by Nunez and the City of Miami,

Plaintiff has suffered damages.

**COUNT V**
**FCRA § 760.10(1)(a)**
**Hostile Work Environment**
**(Against Defendant City of Miami)**

137.    Plaintiff reincorporates the allegations in paragraphs 25-90.

138.    The FCRA prohibits employment discrimination in an individual's terms,

conditions, and privileges of employment because of the individual's sex.  FCRA § 760.10(1)(a).

139.    The City discriminated against Plaintiff because of her sex in violation of Section

FCRA § 760.10(1)(a), by subjecting Ms. Glenn to sexual harassment.

140.    As described throughout this complaint, Nunez's repeatedly engaged in verbal and

physical conduct of a sexual nature, which altered the terms and conditions of Plaintiff's job

performance.

141.    Mr. Nunez would call Plaintiff a "whore" and spread rumors that she was "sleeping

around" with City officials.  The effect of these statements to Ms. Glenn's coworkers created an

unreasonably hostile work environment because of Plaintiff's sex.

142.    From January of 2017 to May of 2017, Defendant Nunez solicited sexual acts from

Plaintiff.

143.    As described in paragraphs 44-57, Defendant Nunez exchanged sexual favors,

including oral sex and digital penetration, for tangible job benefits.  Defendant Nunez induced

Plaintiff to perform oral sex on him, including in Nunez's office, in Plaintiff's downstairs office,

in the City Hall parking lot during breaks at City Commission meetings, and at a sexual encounter

at the Starlight East Motel in January of 2017.

144.     In exchange for the aforementioned sexual acts, Defendant Nunez allowed Plaintiff to attend high-profile events, networking opportunities, and allowed Plaintiff to speak on behalf of the Department at City Commission meetings.  To be sure, Plaintiff only participated in sexual activity with Defendant Nunez because he promised her the aforementioned benefits, including the job as "Assistant Director" of the City's Solid Waste Department.

145.     The harassment was severe and pervasive, and materially altered Plaintiff's working conditions, creating an objectively hostile and abusive working environment that a reasonable person would find hostile or abusive, as well as an environment that Plaintiff perceived as hostile or abusive, which adversely affected the terms, conditions, and privileges of Plaintiff's employment.

146.     Indeed, the severe nature of Mr. Nunez's sexual solicitations, including oral sex and digital penetration on a weekly basis for five months falls well within the broad scope of sexual harassment proscribed by the FCRA.

147.     Moreover, the pervasive nature of Mr. Nunez's solicitation of sexual advances—oral sex weekly, from January 2017 through May of 2017—also creates a hostile work environment.

148.     The City of Miami is automatically vicariously liable for Nunez's supervisory sexual harassment.  Nunez, the Director of the City's Department of Solid Waste, holds such a high position with the Department and the City that he is the alter ego of both.

149.     As a result of the unlawful employment practices by Nunez and the City of Miami, Plaintiff has suffered damages.

**COUNT VI**
**Title VII, 42 U.S.C. § 2000e-2(a)**
**Sexual Harassment – *Quid Pro Quo***
**(Against Defendant City of Miami)**

150.    Plaintiff reincorporates the allegations in paragraphs 25-90.

151.    Title VII prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individuals' sex.

152.    *Quid Pro quo* sexual harassment occurs when an individual submits to sexual overtures in exchange for employment benefits.

153.    Mr. Nunez subjected Plaintiff to unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.

154.    Mr. Nunez gave Plaintiff employment benefits after Plaintiff began performing oral sex on him as per his demands.

155.    As described in paragraphs 44-59, and throughout this Complaint, Mr. Nunez exchanged sexual favors from Plaintiff for tangible job benefits.  During and after Plaintiff performed sexual acts on Mr. Nunez, he would promise Plaintiff the job as "Assistant Director." During and after Plaintiff performed sexual acts on Mr. Nunez, he would invite Plaintiff to speak at press conferences, City Commission meetings, and various executive retreats.

156.    As made clear throughout this Complaint, Plaintiff only submitted to Nunez's sexual demands because he promised her the aforementioned benefits, including the job as "Assistant Director" of the City's Solid Waste Department.

157.    Ultimately, however, Defendant Nunez did not appoint Plaintiff as the "Assistant Director" after she submitted to his sexual demands.  Accordingly, Plaintiff suffered a tangible employment action by losing her job as "Administrative Services Manager" after she acquiesced to Defendant Nunez's sexual overtures.

158.    Plaintiff suffered additional tangible employment actions because she was deemed ineligible to receive Working Out of Class payments for assuming the position as Assistant

Director. Yet, Ms. Glenn was deemed eligible for the position of Assistant Director via placement on the eligible roster. Hence, Plaintiff suffered financial losses because Mr. Nunez denied Plaintiff's Working out of Class application.

159. Defendant City of Miami violated Title VII by discriminating against Plaintiff's terms, conditions, and privileges of employment because of her sex.

160. The City of Miami is automatically vicariously liable for Nunez's supervisory sexual harassment. Nunez, the Director of the City's Department of Solid Waste, holds such a high position with the Department and the City that he is the alter ego of both.

161. As a result of Defendant Nunez's quid pro quo sexual harassment in violation of Title VII, Plaintiff has suffered damages.

<div align="center">

**COUNT VII**
**FCRA § 760.10(1)(a)**
**Sexual Harassment – *Quid Pro Quo***
**(Against Defendant City of Miami)**

</div>

162. Plaintiff reincorporates the allegations in paragraphs 25-90.

163. Title VII prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individuals' sex.

164. *Quid Pro quo* sexual harassment occurs when an individual submits to sexual overtures in exchange for employment benefits.

165. Mr. Nunez discriminated against Plaintiff by altering the terms and conditions of her employment because of her sex.

166. Mr. Nunez subjected Plaintiff to unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.

167. As described in paragraphs 44-59, and throughout this Complaint, Mr. Nunez exchanged sexual favors from Plaintiff for tangible job benefits. During and after Plaintiff

performed sexual acts on Mr. Nunez, he would promise Plaintiff the job as "Assistant Director." During and after Plaintiff performed sexual acts on Mr. Nunez, he would invite Plaintiff to speak at press conferences, City Commission meetings, and various executive retreats.

168.    Defendant City of Miami violated the FCRA by discriminating against Plaintiff's terms conditions, and privileges of employment because of her sex. As made clear throughout this Complaint, Plaintiff only submitted to Nunez's sexual demands because he promised her the aforementioned benefits, including the job as "Assistant Director" of the City's Solid Waste Department.

169.    Ultimately, however, Defendant Nunez did not appoint Plaintiff as the "Assistant Director" after she submitted to his sexual demands.  Accordingly, Plaintiff suffered a tangible employment action by losing her job as "Administrative Services Manager" after she acquiesced to Defendant Nunez's sexual overtures.

170.    Plaintiff suffered additional tangible employment actions because she was deemed ineligible to receive Working Out of Class payments for assuming the position as Assistant Director.

171.    Yet, Ms. Glenn was deemed eligible for the position of Assistant Director via placement on the eligible roster.  Hence, Plaintiff suffered financial losses because Mr. Nunez denied Plaintiff's Working out of Class application.

172.    The City of Miami is automatically vicariously liable for Nunez's supervisory sexual harassment.  Nunez, the Director of the City's Department of Solid Waste, holds such a high position with the Department and the City that he is the alter ego of both.

173.    As an actual and proximate result of Defendant City of Miami's unlawful employment practices in violation of the FCRA, Plaintiff has suffered damages.

**COUNT VIII**
**Title VII, 42 U.S.C. § 2000e-2(a)(1).**
**Disparate Treatment – Gender Discrimination**
**(Against Defendant City of Miami)**

174.   Plaintiff reincorporates the allegations contained in paragraphs 25-90.

175.   Title VII prohibits employers from discriminating against any individual with respect to the terms, conditions, or privileges of employment because of the individual's sex.

176.   A plaintiff may establish gender-based harassment by showing she was targeted with hostile or abusive treatment because she is a woman.

177.   Defendant Nunez targeted Plaintiff with hostile or abusive treatment because she is a woman.  Indeed, Defendant Nunez referred to Plaintiff as a "whore" and spread rumors that she was "sleeping around."  This conduct is textbook gender discrimination.[1]

178.   Further, Defendant Nunez solicited sexual favors from Plaintiff, including oral sex and digital penetration.

179.   Nonetheless, Defendant Nunez targeted Plaintiff with hostile and abusive treatment because she is a woman.

180.   The City of Miami is automatically vicariously liable for Nunez's supervisory sexual harassment.  Nunez, the Director of the City's Department of Solid Waste, holds such a high position with the Department and the City that he is the alter ego of both.

181.   As a result of Defendant Nunez's intentional gender discrimination against Plaintiff because of her sex, in violation of the FCRA, Plaintiff has suffered damages.

**COUNT IX**
**FCRA, 760.10**
**Disparate Treatment – Gender Discrimination**
**(Against Defendant City of Miami)**

---

[1] According to *Merriam-Webster* dictionary, the definition of a "whore," in relevant part, is "a person engaged in sexual intercourse for pay as a prostitute" or, as an "*offensive*: a promiscuous or immoral woman."

29

182.    Plaintiff reincorporates the allegations in paragraphs 25-90.

183.    The FCRA prohibits employers from discriminating against any individual with respect to the terms, conditions, or privileges of employment because of the individual's sex.

184.    A plaintiff may establish gender-based harassment by showing she was targeted wit hostile or abusive treatment because she is a woman.

185.    Defendant Nunez targeted Plaintiff with hostile or abusive treatment because she is a woman.  Indeed, Defendant Nunez referred to Plaintiff as a "whore" and spread rumors that she was "sleeping around."  This conduct is textbook gender discrimination.[2]

186.    Further, Defendant Nunez solicited sexual favors from Plaintiff, including oral sex and digital penetration.

187.    Nonetheless, Defendant Nunez targeted Plaintiff with hostile and abusive treatment because she is a woman.

188.    The City of Miami is automatically vicariously liable for Nunez's supervisory sexual harassment.  Nunez, the Director of the City's Department of Solid Waste, holds such a high position with the Department and the City that he is the alter ego of both.

189.    As a result of Defendant Nunez's intentional gender discrimination against Plaintiff because of her sex, in violation of Title VII, Plaintiff has suffered damages.

## COUNT X
### Title VII, 42 U.S.C. § 2000e-3(a)
### Retaliation
### (Against Defendant City of Miami)

190.    Plaintiff reincorporates the allegations in paragraphs 25-90.

191.    Title VII prohibits employers from discriminating against individual's for complaining or participating in investigations to unlawful employment practices.

---

[2] *See supra* note 1.

192.    An employer discriminates against an employee in violation of the Title VII's anti-retaliation provision when the employer takes a materially adverse action against the employee because the employee engaged in protected activity.

193.    Plaintiff engaged in protected activity when she complained about a hostile work environment based on her race and sex, among other ways, to the City of Miami Labor Department, and with the City's Assistant City Manager, and then when she filed charges of discrimination with the EODP and the EEOC and the FCRA.

194.    Mr. Nunez was aware of Plaintiff's complaints.  In fact, the Labor Department meeting Plaintiff had scheduled for July 25, 2016 was indefinitely postponed at Mr. Nunez's behest.  Mr. Nunez was aware of Plaintiff's complaints to the EODP because he participated in the investigation.  Similarly, Mr. Nunez was aware of Plaintiff's Charge of discrimination with the EEOC because the City of Miami interviewed Mr. Nunez in preparing their position statement to Ms. Glenn's Charge.

195.    Shortly after Plaintiff filed her complaints, Defendant City of Miami initiated a series of retaliatory events that would dissuade a reasonable person from complaining about discrimination.

196.    After Plaintiff complained about Mr. Nunez to the Labor Department, Mr. Nunez refused to cooperate with Ms. Glenn.  He still called her "the person next door," "incompetent," and a "whore."  Then, after Plaintiff complained to the Assistant City Manager, Mr. Nunez began flirting with Plaintiff.  Then he touched her inappropriately.  He digitally penetrated her.  He induced her to perform oral sex on him—dozens of times—in exchange for unfulfilled job promises.

197.    After Ms. Glenn filed her race and sexual harassment discrimination charges with the EODP, the City transferred Plaintiff to another department.

198.    Defendants took the aforementioned adverse actions against Plaintiff because of her protected activities.  Indeed, but for Ms. Glenn's filing of sexual harassment complaint against Mr. Nunez, the City would have never transferred Plaintiff.

199.    Hence, for the foregoing reasons, Defendant discriminated against Plaintiff in violation of Title VII.

200.    As a result of the City's unlawful retaliation in violation of Title VII, Plaintiff has suffered damages.

<div align="center">

**COUNT XI**
**FCRA § 760.10(7)**
**Retaliation**
**(Against Defendant City of Miami)**

</div>

201.    Plaintiff reincorporates the allegations in paragraphs 25-90.

202.    An employer discriminates against an employee in violation of the FCRA's anti-retaliation provision when the employer takes a materially adverse action against the employee because the employee engaged in protected activity.

203.    Plaintiff engaged in protected activity when she complained about a hostile work environment based on her race and sex, among other ways, to the City of Miami Labor Department, and with the City's Assistant City Manager, and then when she filed charges of discrimination with the EODP and the EEOC and the FCRA.

204.    Mr. Nunez was aware of Plaintiff's complaints.  In fact, the Labor Department meeting Plaintiff had scheduled for July 25, 2016 was indefinitely postponed at Mr. Nunez's behest.  Mr. Nunez was aware of Plaintiff's complaints to the EODP because he participated in the investigation.  Similarly, Mr. Nunez was aware of Plaintiff's Charge of discrimination with the

EEOC because the City of Miami interviewed Mr. Nunez in preparing their position statement to Ms. Glenn's Charge.

205.    Shortly after Plaintiff filed her complaints, Defendant City of Miami initiated a series of retaliatory events that would dissuade a reasonable person from complaining about discrimination.

206.    After Plaintiff complained about Mr. Nunez to the Labor Department, Mr. Nunez refused to cooperate with Ms. Glenn.  He still called her "the person next door," "incompetent," and a "whore."  Then, after Plaintiff complained to the Assistant City Manager, Mr. Nunez began flirting with Plaintiff.  Then he touched her inappropriately.  He digitally penetrated her.  He induced her to perform oral sex on him—dozens of times—in exchange for unfulfilled job promises.

207.    After Ms. Glenn filed her race and sexual harassment discrimination charges with the EODP, the City transferred Plaintiff to another department.

208.    Defendants took the aforementioned adverse actions against Plaintiff because of her protected activities.  Indeed, but for Ms. Glenn's filing of sexual harassment complaint against Mr. Nunez, the City would have never transferred Plaintiff.

209.    Hence, for the foregoing reasons, Defendant discriminated against Plaintiff in violation of the FCRA § 760.10(7).

210.    As a result of Defendant's unlawful retaliation, in violation of the FCRA, Plaintiff has suffered damages.

## COUNT XII
### Battery
### (Against Defendant Nunez)

211.    Plaintiff reincorporates the allegations in paragraphs 25-90.

212.   Defendant Nunez intentionally and unlawfully touched Plaintiff in a harmful and offensive manner.

213.   As described in paragraphs 44-53, Defendant Nunez intentionally touched Plaintiff, inter alia, by groping her legs and thighs, digitally penetrating her, wrapping her hand around his genitals, pressing her head down to his crotch to perform oral sex.

214.   Defendant Nunez's actions created an offensive contact with Plaintiff and were not consensual.  Plaintiff did not consent to Defendant Nunez's offensive touching of Plaintiff's legs and thighs in his office.  Plaintiff did not consent to Defendant Nunez wrapping Plaintiff's hand around his genitals.

215.   Defendant Nunez's acts were intentional, and he is liable for the battery inflicted upon Plaintiff.

216.   As a direct and proximate result of the intentional battery by Defendant Nunez, Plaintiff has suffered damages.

217.   Further, these actions were taken under circumstances that amount at least to a willful and wanton disregard for Plaintiff's rights, and therefore, punitive damages for the common-law tort of battery are warranted.

<u>**COUNT XIII**</u>
**Intentional Infliction of Emotional Distress**
**(<u>Against Defendant Nunez</u>)**

218.   Plaintiff reincorporates the allegations contained in paragraphs 25-90.

219.   Defendant Nunez's conduct described throughout this Complaint was intentional and/or reckless, extreme and outrageous, and was the actual and proximate cause of Plaintiff's severe emotional distress, including diagnoses of anxiety, depression, and multiple prescription medications Plaintiff still takes today.

220.   Defendant Nunez intentionally and/or recklessly induced Plaintiff to perform sexual acts over a five month period in exchange for tangible job benefits.

221.   Defendant's conduct was extreme and outrageous.  Placing a subordinate's hands on his genitals, groping her body, inducing her to perform oral sex, digitally penetrating her, calling her a "whore," spreading rumors that she was "sleeping around" and treating her without any respect goes beyond the bounds of decency accepted by our society.

222.   Defendant Nunez's conducted was an actual and proximate cause of Plaintiff's severe emotional distress.  Indeed, but for Defendant Nunez's conducted described in paragraph 203, and throughout this Complaint, Plaintiff would not have been diagnosed with anxiety and depression, or forced to take medical leave.

223.   Plaintiff was diagnosed with anxiety and depression, and was and is prescribed multiple medications because of Defendant Nunez's outrageous conduct.

224.   As an actual and proximate result of Defendant Nunez's conduct, Plaintiff has suffered damages.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff demands judgment against Defendants City of Miami and Defendant Nunez containing the following relief:

A.   The basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights.  Damages also provide incidental deterrence and should be awarded to one plaintiff to deter future official misconduct to others.

B.   An order directing Defendant City of Miami to place Plaintiff in the position her would have had but for Defendant's discriminatory, retaliatory and/or otherwise unlawful treatment of Plaintiff.

C.    An award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for the deprivation of her constitutional rights.

D.    An award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

E.    An award of damages in an amount to be determined at trial, plus

F.    An award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to compensation for her severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence, personal dignity, the opportunity to pursue an equal employment opportunity, and emotional pain and suffering and other physical or mental injuries;

G.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

H.    An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

I.    An award of liquidated damages;

J.    An award of punitive damages against Defendant Nunez for his conduct motivated against Plaintiff by evil motive or intent, and his reckless and/or callous indifference to Plaintiff's federally protected rights.

K.      Pursuant to 42 U.S.C. § 1988, an award of costs that Plaintiff has incurred in this Action, as well as Plaintiff's reasonable attorneys' fees plus costs and interest to the fullest extent permitted by law; and

L.      Such other and further relief the Court deems just and proper.

## JURY DEMAND

Plaintiff Michelle Glenn hereby demands a jury trial of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Section 102 of the Civil Rights Act of 1991.

Dated: April 14, 2021

<div style="margin-left:40%">

Respectfully submitted,

By: /s/ Caroline H. Miller
Caroline H. Miller, Esq.
Fl Bar No. 1012331
**DEREK SMITH LAW GROUP, PLLC**
*Attorneys for Plaintiff Michelle Glenn*
701 Brickell Ave., Suite 1310
Miami, Florida 33131
(305) 946-1884
caroline@dereksmithlaw.com

</div>